IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CARRIE SMITH, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FLIX ENTERTAINMENT, LLC, d/b/a FLIX BREWHOUSE,<br><br>Defendant. | No. 1:25-cv-01568-RLY-MG<br><br>Hon. Richard L. Young, District Judge<br>Hon. Mario Garcia, Magistrate Judge |

**AMENDED COMPLAINT**

Plaintiff Carrie Smith, on behalf of herself and all others similarly situated, complains of Flix Entertainment, LLC, d/b/a Flix Brewhouse ("Flix" or "Defendant"), as follows, on information and belief except as to her own experiences and matters of public record:

**INTRODUCTION**

1. "When shopping for a good or service, consumers want to know: how much?"[1]

2. In the entertainment industry in particular, "fans should know the full cost of their tickets from the start."[2]

3. After all, the "all-in price"—that is, the base price of the ticket plus any mandatory fees and charges imposed by the seller—"is the real price of admission."[3]

---

[1] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).
[2] Senate Judiciary Hearing Jan. 24, 2023, Opening Statement of Joe Berchtold, President and Chief Financial Officer, Live Nation Entertainment, Inc., at 5, https://www.judiciary.senate.gov/imo/media/doc/Testimony%20-%20Berchtold%20-%202023-01-24.pdf/ (last accessed May 14, 2026).
[3] *Id.*

4. "Unfortunately, consumers face widespread and growing unfair and deceptive fee practices that make it much harder to find out" the answer to this basic question.[4]

5. One such unfair and deceptive practice is called "drip pricing."

6. "Drip pricing" is the practice of listing one price for a good or service up front, then adding one or more hidden "junk fees" to the total price just before the consumer decides to complete the transaction.

7. Drip pricing is a form of dishonest bait-and-switch advertising.

8. For this reason, it is prohibited by state and federal consumer protection laws.

9. Until recently, Flix did just what the law prohibits. It listed one upfront price to entice consumers into making a purchasing decision, only to pull the rug out from under their feet at the last stage of the transaction by adding a hidden, mandatory junk fee when consumers have already decided to complete the transaction in reliance on the upfront price.

10. Plaintiff Carrie Smith purchased tickets to movie screenings at one of Flix's movie theaters through its website. The prices of these tickets were misleadingly and unlawfully advertised as lower than the total prices Smith would pay after Flix smuggled in its junk fees just as she was completing the transactions.

11. On her own behalf and on behalf of all other similarly injured consumers, Smith brings this action to remedy the injuries Flix's dishonest business practices have caused.

## JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332(d)(2) because the parties and putative class members are minimally diverse, the amount in

[4] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).

controversy exceeds $5,000,000 exclusive of interest and costs, and the number of all putative class members is at least 100.

13. Venue is proper in this Court under § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

14. Plaintiff Carrie Smith is a resident of Indianapolis, Indiana.

15. Defendant Flix Entertainment, LLC, is a limited liability company organized under the laws of Texas with its principal place of business at 555 Round Rock West Drive, Suite D100, Round Rock, TX 78681.

16. The only member of Flix Entertainment, LLC, is Hospitality Investors, Inc., a corporation incorporated under the laws of Texas with its principal place of business at 2000 S. Interstate 35, Suite Q11, Round Rock, TX 78681.

## FACTUAL ALLEGATIONS

### I. Drip pricing harms consumers.

17. "Hidden fees" refer to fees charged by sellers in consumer transactions that are obscured from the consumer.[5] Hidden fees are a kind of "junk fees."[6] Such fees are "mandatory but not transparently disclosed to consumers."[7] Consumers may be "lured in with the promise of

---

[5] *See* Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 7 (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%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%20-%20FINAL.pdf/.

[6] Fed. Trade Comm'n, *FTC Proposes Rule to Ban Junk Fees* (Oct. 11, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees/ (discussing "hidden fees" as a "junk fee practice[]").

[7] The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, The White House (March 5, 2024), https://web.archive.org/web/20250118015252/https://www.whitehouse.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/.

a low price, but when they get to the register, they discover that price was never really available."[8] Hidden junk fees are thus "an evolution of bait-and-switch schemes."[9]

18. The practice of disclosing hidden or junk fees "late in the buying process" is often called "drip pricing."[10] Using drip pricing, "firms advertise only part of a product's total price to lure in consumers."[11] Then, once "the consumer already has spent significant time selecting and finalizing a product or service plan to purchase," the mandatory junk fees are disclosed.[12]

19. As an example of drip pricing of junk fees, the FTC has pointed to "'convenience fee[s]' that appear[] only when a shopper reaches the check-out screen":[13]




20. Consumers "feel committed to a purchase" at this stage of the transaction and thus go through with it anyway, despite feeling "frustrated" that "they have no idea how much it costs until it's too late."[14] "Even when consumers who have experienced drip pricing are aware of the

[8] *Id.*
[9] *Id.* n.2.
[10] *Bringing Dark Patterns to Light*, *supra* note 5, at 8–9.
[11] *Id.* at 8.
[12] *Id.* at 9.
[13] *Id.* at 23, 30.
[14] *Id.* at 9.

total price and are given the option to change their selection, many do not, despite being dissatisfied."[15]

21. Advertised prices are important to consumers' decisions to investigate, consider, and eventually purchase goods and services. Indeed, price is perhaps the *most* important aspect of consumer transactions.[16]

22. "[S]everal psychological mechanisms" are responsible for drip pricing's effectiveness at influencing consumer behavior. Once a consumer has committed to a purchase, "abandoning it" in the face of drip-priced junk fees "may cause feelings of uncertainty, dissatisfaction and cognitive dissonance." Drip pricing practitioners may "rely on the extra effort that would be required" for consumers to back out of the transaction at its last step, "such that consumers accept the price increasing later in the purchase process."[17]

23. In turn, "[s]everal behavioural biases" drive these mechanisms, including "anchoring," or the tendency to "anchor on initial price information" without "fully adjust[ing]" one's "view of the price" once all mandatory fees are disclosed; the "sunk cost fallacy," or the tendency to "continue with a process if [consumers] have invested time or effort"; and the "endowment effect," or the tendency to "place a higher value on objects [consumers] own, or have imagined owning."[18]

24. Drip pricing harms consumers.

---

[15] U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 29 (Apr. 2022), https://assets.publishing.service.gov.uk/media/624c27c68fa8f527710aaf58/Online_choice_architecture_discussion_paper.pdf/.

[16] *See, e.g.*, Huiliang Zhao *et al.*, *Impact of Pricing and Product Information on Consumer Buying Behavior with Customer Satisfaction in a Mediating Role*, 12 Frontiers in Psychology 720151 (2021), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

[17] *Online Choice Architecture*, *supra* note 15, at 30.

[18] *Id.*

25. "Junk fees cost American families tens of billions of dollars each year and inhibit competition, hurting consumers, workers, small businesses, and entrepreneurs."[19]

26. "Drip pricing has been shown in several experimental, theoretical and real-world contexts to lead consumers to buy more, overspend, underestimate the total price, make mistakes when searching, and be less happy with their purchases."[20]

27. As one individual commenter put it to the FTC, drip pricing is "endless, ubiquitous and makes it extremely difficult for consumers to make informed decisions."[21]

28. As another individual commenter put it to the FTC, "It's one thing to be on guard when walking down a dark alley, but being on guard every time you want to take a vacation, go to a concert, fly home to see a sick loved one—that's just not fair."[22]

29. "Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction."[23]

30. According to one study, consumers who were not shown full prices, including mandatory fees, at the beginning of a transaction "ended up spending about 20% more money and were 14% more likely to complete [it]" than consumers to whom junk fees were disclosed up front.[24]

---

[19] The White House, *Biden-Harris Administration Announces Broad New Actions to Protect Consumers From Billions in Junk Fees* (Oct. 11, 2023), https://web.archive.org/web/20250118020934/https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/11/biden-harris-administration-announces-broad-new-actions-to-protect-consumers-from-billions-in-junk-fees/.

[20] *Online Choice Architecture*, *supra* note 15, at 30.

[21] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).

[22] *Id.*

[23] *Bringing Dark Patterns to Light*, *supra* note 5, at 9.

[24] *Id.*

31. Another study found that consumers "based their purchase decision exclusively on the base price," that is, the price before hidden fees were added.[25]

32. Drip pricing thus causes consumers to "spend more than they intend, choose unsuitable products and waste their time."[26]

33. Drip pricing harms honest businesses, too.

34. An "honest business that sets forth the total price of its product at the outset will be at a significant disadvantage when compared to a seller that advertises an artificially low price to draw consumers in, then adds mandatory charges late in the transaction."[27]

35. Drip pricing thereby harms free and fair competition.

36. "Since consumers are more likely to choose products based on characteristics they find most salient, businesses will tend to compete harder on those characteristics and less hard on less salient characteristics." Mandatory fees disclosed only at the final stages of a transaction are definitionally "less salient" than up-front prices, and therefore generate "little to no competition."[28]

37. One experimental study found that sellers "set the highest possible drip price, and compete only on base prices."[29]

38. For this reason, drip pricing is difficult or impossible to correct using only market pressures.[30]

---

[25] Alexander Rasch, Miriam Thöne, Tobias Wenzel, *Drip Pricing and Its Regulation: Experimental Evidence*, 176 J. Econ. Behavior & Org. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189/, *pre-print available at* https://www.econstor.eu/bitstream/10419/181760/1/1029741549.pdf/.
[26] *Online Choice Architecture*, *supra* note 15, at 30.
[27] *Bringing Dark Patterns to Light*, *supra* note 5, at 9.
[28] *Online Choice Architecture*, *supra* note 15, at 30.
[29] *Drip Pricing and Its Regulation*, *supra* note 25.
[30] *Online Choice Architecture*, *supra* note 15, at 31 ("Where there are enough consumers who do not detect and avoid drip pricing, competitive pressures may also not be sufficient to incentivise businesses to educate or provide more upfront price information to consumers.").

39. The law must intervene.[31]

## II. State and federal consumer protection laws protect consumers against drip pricing.

40. "There is nothing new about businesses using bait-and-switch tactics to reel in and deceive consumers,"[32] and likewise nothing new about the protection afforded against such tactics by state and federal consumer protection laws.

41. Like others across the country, Indiana consumer protection law prohibits "any unfair, abusive, or deceptive act, omission, or practice."[33] These consumer protection laws prohibit bait-and-switch tactics designed to extract additional value from consumers, over and above advertised prices, through deceit and psychological manipulation.

42. Federal law likewise prohibits dishonest bait-and-switch advertising like drip pricing. Section 5(a) of the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."[34]

43. The FTC has brought enforcement actions against drip pricing practices for violating Section 5(a). For example, in *Federal Trade Commission v. Liberty Chevrolet, Inc.*, the agency alleged among other things that a car dealership advertised "vehicles for sale at a specific price but then fail[ed] to honor those prices."[35] The dealership falsely represented that consumers could purchase cars for advertised prices that "failed to include an additional certification fee."[36] Consumers would invariably find that the advertised car could "only be purchased for a higher

---

[31] *See id.* (discussing regulatory interventions).
[32] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).
[33] Ind. Code § 24-5-0.5-3(a).
[34] 15 U.S.C. § 45(a).
[35] Compl. ¶ 10, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF No. 7.
[36] *Id.* ¶ 11.

price" that included the fee.[37] The dealership thereby "charge[d] consumers higher sales prices than advertised"[38] in violation of Section 5(a).[39]

44. The FTC has also warned businesses that drip pricing invites Section 5(a) enforcement. For example, the agency has warned hotel operators that failure to disclose mandatory fees up front "may violate the law by misrepresenting the price consumers can expect to pay for their hotel rooms."[40]

45. In furtherance of its authority "to define with specificity unfair or deceptive acts or practices" under the FTC Act, the FTC has recently promulgated a Rule on Unfair or Deceptive Fees, which prohibiting drip pricing in the live-event ticketing and short-term lodging industries specifically—two industries in which "there is a long history of consumer harm."[41]

**III. Flix's website has dishonestly baited consumers using drip pricing.**

46. Flix has charged consumers a junk "service charge" as part of a deceptive drip pricing scheme when they purchased tickets from Flix's website.

47. Flix never disclosed to consumers that they would be assessed a service charge until after they had already selected their tickets and were advertised a base ticket price.

---

[37] *Id.*
[38] *Id.*
[39] *Id.* ¶¶ 35–37. The case settled for $1,500,000 in consumer refunds and permanent injunctive relief. *See Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF Nos. 15–16.
[40] Fed. Trade Comm'n, *Model Warning Letter* 1 (Nov. 2012), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/121128hoteloperatorsletter.pdf/; *see* Fed. Trade Comm'n, *FTC Warns Hotel Operators that Price Quotes that Exclude 'Resort Fees' and Other Mandatory Surcharges May Be Deceptive* (Nov. 28, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/11/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/.
[41] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,077 (Jan. 10, 2025).

48. Flix never disclosed the "service" purportedly paid for by the "service charge." There was no additional "service" being provided at the time of checkout.

49. Flix was merely assessing a junk fee and requiring consumers to "pay to pay" for their tickets.

50. When a consumer visited Flix's website, on the main page, she was asked to select a movie and theater location:




51. She was next asked to select a showtime:



52. After deciding whether to proceed as a "guest" or a Flix account holder, the consumer was next asked to select a seat:




54. After selecting a seat and clicking "Continue to tickets," the consumer would next be taken to a ticket selection screen:



56. This page included a prominent countdown timer that started ticking when the page was loaded. This tactic is intended to create a false impression of time scarcity in the user's mind and thereby induce her to act quickly while glossing over details.[42]

57. Though the ticket price is shown to the consumer as the "Total to Pay," that is false.

58. So much for the bait. Now the switch.

59. Only after the consumer clicked "Continue to Payment" was the true cost of the transaction revealed to her:




60. A $1.85 "Service Charge" had been surreptitiously added to the consumer's "Total to Pay," which had now climbed to $16.10, despite the fact that nothing about her selections had changed between this screen and the previous one.

---

[42] *See Bringing Dark Patterns to Light*, *supra* note 3, at 22.

61. Meanwhile, the clock continued to tick, strongly prompting the consumer not to think too hard about the no-benefit fees being extracted from her by Flix.

62. Flix's drip pricing scheme thus enticed consumers to make one decision after another—including movie, theater location, showtime, number of tickets, type of tickets, seat locations, and account status—on the promise that the "Total to Pay" she was shown would be just that, psychologically committing the consumer to the transaction be requiring her to expend time and effort, all under Flix-imposed time pressure, before offering so much as a hint that, at the final step, Flix would require the consumer to pay more money in exchange for absolutely nothing.

**IV. Smith is a victim of Flix's deceptive drip pricing practices.**

63. Smith has purchased 20 or 30 tickets for screenings at Flix theaters since approximately 2015.

64. Despite this, Flix's drip pricing scheme was so effective in its deception that Smith did not even realize the junk fees were being extracted until approximately 2019.

65. Even after she began noticing Flix's no-service "service charges," Smith never felt as though she had enough time to investigate them properly in light of the pressure imposed by Flix's countdown timer.

66. Among other occasions, Smith has paid Flix's junk fees on May 24, 2024, for a screening of *Furiosa: A Mad Max Saga* at its location in Carmel, Indiana; on July 1, 2024, for a screening of *Deadpool & Wolverine* at its Carmel location; and on November 5, 2024, for a screening of *Venom: The Last Dance* at its Carmel location.

67. Flix's records will include other dates and times at which Smith paid its junk fees.

68. Flix's drip pricing scheme has extracted approximately $36 to $54 in junk fees from Smith.

## CLASS ALLEGATIONS

69. Plaintiff brings this action under Federal Rule of Civil Procedure 23, on behalf of herself and all others similarly situated.

70. Subject to future amendment or revision, Plaintiff seeks to represent the following putative class ("Class"):

> All Indiana residents who purchased tickets on Flix's website between August 6, 2023, and the date on which Flix began disclosing a "booking fee" on the ticket selection screen.

71. Excluded from the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

72. The Class is so numerous that joinder of all of its members is impracticable, as Plaintiff estimates their numbers to be in the thousands.

73. There are questions of law and fact common to the Class, including without limitation (a) whether Defendant has charged hidden junk fees through drip pricing; (b) whether Defendant's conduct violates applicable state consumer protection laws; (c) whether Defendant's conduct was false or misleading; and (d) whether Defendant has been unjustly enriched by its violation of Plaintiff's rights.

74. Plaintiff's claims are typical of the Class's. Plaintiff and Class members share the same rights under the same laws, which Defendant has injured in the same way by charging illegal junk fees through drip pricing.

75. Plaintiff will fairly and adequately protect the Class's interests, as Plaintiff shares their interest in avoiding illegal drip pricing; has no interest adverse to them; and has retained competent counsel experienced in consumer protection and class action litigation.

76. The questions of law and fact common to Plaintiff and the Class predominate over any individualized questions because, among other reasons, Defendant has violated their rights under the same laws by the same conduct.

77. A class action is superior to other available methods for adjudicating this controversy because, among other reasons, the claims at issue may be too small to justify individual litigation.

## CLAIMS TO RELIEF

### COUNT I
### Violation of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3(a) On behalf of the Class

78. Plaintiff realleges paragraphs 1–68 above.

79. Defendant engaged in an unfair, abusive, or deceptive act, omission, or practice by advertising one up-front price not available to any consumer and charging a different, higher price, which included a hidden, mandatory fee.

80. Plaintiff relied Defendant's falsely advertised base price in entering into the transactions with Defendant.

81. Defendant's drip pricing was a willfully deceptive practice because it was the result of intentional design choices intended to bait consumers.

82. For Defendant's violation of the Deceptive Consumer Sales Act, Plaintiff seeks actual damages or $500, whichever is greater, trebled.

### COUNT II
### Unjust Enrichment Indiana Common Law On behalf of the Class

83. Plaintiff realleges paragraphs 1–68 above.

84. Defendant received a benefit at Plaintiff's expense when Plaintiff paid the junk "service fee" Defendant charged.

85. Defendant has unjustly retained the benefit Plaintiff conferred on it because Defendant procured the benefit through unlawful and misleading drip pricing, as well as through the oppressive psychological mechanisms on which drip pricing depends.

86. For Defendant's unjust enrichment, Plaintiff seeks restitution of the benefits she paid and Defendant unjustly retained.

**PRAYER FOR RELIEF**

87. Plaintiff asks the Court to

a. Certify this action as a class action under Federal Rule of Civil Procedure 23; appoint Plaintiff as Class representative; and appoint Plaintiff's counsel as Class counsel;

b. Enter a final judgment in Plaintiff's and the Class's favor that awards treble actual or statutory damages to Plaintiff and the Class, according to proof; awards restitution to Plaintiff and the Class, according to proof; and awards pre- and postjudgment interest, as allowed by law;

c. Award Plaintiff and her counsel their reasonable costs and fees incurred in prosecuting this action, as allowed by law; and

d. Order such further relief as the Court deems appropriate.

**JURY DEMAND**

88. Plaintiff demands a trial by jury on all issues so triable.

[*Signature page follows*]

DATE: May 15, 2026

Respectfully submitted,

/s/ *Lynn A. Toops*

Lynn A. Toops
Vess A. Miller
Ian R. Bensberg
**CohenMalad, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
ltoops@cohenmalad.com
vmiller@cohenmalad.com
ibensberg@cohenmalad.com

*Attorneys for Plaintiff Carrie Smith*